Richard D. McCune (SBN 132124)
rdm@mccunewright.com
David C. Wright (SBN 177468)
dcw@mccunewright.com
Steven A. Haskins (SBN 238865)
sah@mccunewright.com
Mark I. Richards (SBN 321252)
mir@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

*Counsel for Plaintiffs and the Putative Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ZACHERY WILLIAMS and MICHAEL MA, on behalf of themselves and all others similarly situated, | Case No.:  4:20-cv-08208-HSG |
| Plaintiffs, | **PLAINTIFF MICHAEL MA'S OPPOSITION TO DEFENDANT TESLA, INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| v. | |
| TESLA, INC. and DOES 1 through 10, inclusive, | Hearing Date:   November 18, 2021 |
| Defendants. | Hearing Time:   2:00 p.m. |
| | Courtroom:      2 |
| | Judge:          Hon. Haywood S. Gilliam Jr. |

# **TABLE OF CONTENTS**

*Page*

I   INTRODUCTION ................................................................................................. 1

II   ARGUMENT ...................................................................................................... 2

    A.   The SAC Satisfactorily Pleads Tesla's Fraudulent Omissions ........................... 2

        1.   Ma Alleges Exclusive (or Superior Knowledge) About the Suspension Defect .... 3

        2.   The 2013 TSB Demonstrates Tesla's Pre-Sale Knowledge .................................. 5

        3.   The SAC Pleads Tesla's Omissions About the Suspension Defect and Ma's Reliance on Those Omissions ................................................................................ 8

        4.   Ma Pleads that Tesla's Omission of Information About the Suspension Defect Is Material .......................................................................................................... 11

    B.   The Economic Loss Rule Does Not Bar Ma's Fraudulent Concealment Claim ............... 12

    C.   Ma Is Entitled to Injunctive Relief ................................................................. 18

        1.   Ma Demonstrates Standing to Seek an Injunction ........................................... 18

        2.   Ma Lacks an Adequate Remedy at Law Thereby Allowing Ma to Seek an Injunction ......................................................................................................... 19

    D.   Ma May Obtain Leave To Amend ................................................................... 21

III   CONCLUSION ................................................................................................. 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

*Page(s)*

Cases

*Acedo v. DMAX, Ltd.*,
    15-02443 MMM(ASX), 2015 WL 129123565 (C.D. Cal. July 31, 2015) .................................... 6

*Aguila v. General Motors LLC*,
    NO. 1:13-CV-00437-LJO, 2013 WL 3872502 (E.D. Cal. July 25, 2013) .................................... 5

*Andresen v. Int'l Paper Co.*,
    No. 2:13-cv-02079-CAS(AJWx), 2014 WL 2511283 (C.D. Cal. June 3, 2014) .......................... 9

*Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*,
    547 F.3d 48 (1st Cir. 2008) ........................................................................................................ 17

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal. 4th 503 (1994) ................................................................................................................. 15

*Baranco v. Ford Motor Co.*,
    294 F. Supp. 3d 950 (9th Cir. 2018) .......................................................................................... 10

*Boschma v. Home Loan Ctr., Inc.*,
    198 Cal. App. 4th 230 (2011) ..................................................................................................... 15

*Bryde v. General Motors, LLC*,
    No. 16-cv-02421-WHO, 2016 WL 6804584 (N.D. Cal. Nov. 17, 2016) .................................... 19

*Burch v. CertainTeed Corp.*,
    34 Cal. App. 5th 341 (2019) ....................................................................................................... 14

*Centurion Properties III, LLC v. Chicago Title Ins. Co.*,
    793 F.3d 1087 (9th Cir. 2015) .................................................................................................... 17

*Clark v. Am. Honda Motor Co.*,
    No. CV 20-03147 AB (MRWx), --- F. Supp. 3d ---, 2021 WL 1186338
    (C.D. Cal. Mar. 25, 2021) ..................................................................................................... 3, 10

*Collins v. eMachines*,
    202 Cal. App. 4th 249 (2011) ................................................................................................... 3, 4

*Continental Airlines, Inc. v. Intra Brokers, Inc.*,
    24 F.3d 1099 (9th Cir. 1994) ...................................................................................................... 19

*Cook, Perkiss and Liehe, Inc. v. No. Calif. Collection Serv. Inc.*,
    911 F.2d 242 (9th Cir. 1990) ...................................................................................................... 22

*County of Santa Clara v. Atlantic Richfield Co.*,
    137 Cal. App. 4th 292 (2006) ................................................................................................ 16, 17

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) .................................................................................................... 10

**TABLE OF AUTHORITIES (cont.)**

*Page(s)*

*Davidson v. Kimberly Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ................................................................ 19

*Diamond Multimedia Sys., Inc. v. Superior Court*,
19 Cal. 4th 1036 (1999) ........................................................................ 16

*Diversified Indus., Inc. v. Vinyl Trends, Inc.*,
No. 13-6194 (JBS/JS), 2014 WL 1767471 n.6 (D.N.J. May 1, 2014) .......................... 10

*Eastwood v. Horse Harbor Found., Inc.*,
170 Wash. 2d 380 (2010) ...................................................................... 13

*Erlich v. Menezes*,
21 Cal. 4th 543 (1999) ..................................................................... passim

*Falk v. General Motors Corp.*,
496 F. Supp. 2d 1088 (N.D. Cal. 2007) ............................................... 2, 4, 6, 11

*Freedom Transport, Inc. v. Travelers Cos., Inc.*,
No. EDCV 16-213 JGB (SPx), 2016 WL 7496731 (C.D. Cal. Mar. 24, 2016) ............ 14

*Gibson v. Jaguar Land Rover North America, LLC*,,
CV20-00769-CJC(GJSx), 2020 WL 5492990 (C.D. Cal. Sept. 9, 2020) .................... 21

*Grynberg v. Citation Oil & Gas Corp.*,
573 N.W.2d 493 (S.D. 1997) .................................................................. 16

*In re Ford Motor Co. DPS6 Powershift Transmission Products Liability Litigation*,
483 F. Supp. 3d 838 (C.D. Cal. 2020) .................................................... 13, 15

*In re MacBook Keyboard Litigation*,
No. 5:18-cv-02813-EJD, 2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) ................... 21

*In re MyFord Touch Consumer Litig.*,
46 F. Supp. 3d 936 (N.D. Cal. 2014) ..................................................... 3, 12

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...................................................... 18

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
684 F. Supp. 2d 942 (N.D. Ohio 2009) ...................................................... 10

*Jimenez v. Superior Court*,
29 Cal. 4th 473 (2002) ........................................................................ 13

*Klaehn v. Cali Bamboo, LLC*,
No. 19cv1498-LAB (KSC), 2020 WL 3971518 (S.D. Cal. July 13, 2020) ................. 21

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

1

**TABLE OF AUTHORITIES (cont.)**

2

*Page(s)*

3

*Koniag, Inc. v. Koncor Forest Resource,*
    39 F.3d 991 (9th Cir. 1994) ................................................................................................ 19

4

*MacDonald v. Ford Motor Company,*
    37 F. Supp. 3d 1087 (N.D. Cal. 2014) ............................................................................ 6, 7

5

6

*Marolda v. Symantec Corp.,*
    572 F. Supp. 2d 992 (N.D. Cal. 2009) ................................................................................. 3

7

*McCarthy v. Toyota Motor Corporation,*
    No. 8:18-cv-00201-JLS-KES, 2019 WL 3220579 (C.D. Cal. April 9, 2019) ...................... 6

8

9

*McVicar v. Goodman Global Inc.,*
    No. SACV 13-1223-DOC (RNBX), 2014 WL 12573992 (C.D. Cal. Nov. 13, 2014) .................. 6

10

*McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers—Centerra LLC,*
    486 P.3d 439 (Col. Ct. App. Jan. 14, 2021) ...................................................................... 17

11

12

*Mui Ho v. Toyota Motor Corporation,*
    931 F. Supp. 2d 987 (N.D. Cal. 2013) ............................................................................ 7, 11

13

*NuCal Foods, Inc. v. Quality Egg LLC,*
    918 F. Supp. 2d 1023 (E.D. Cal. 2013) ............................................................................. 12

14

15

*Obde,v. Schlemeyer,*
    56 Wash. 2d 449 (1960) ................................................................................................ 13, 17

16

17

*Obertman v. Electrolux Home Care Prods., Inc.,*
    482 F. Supp. 3d 1017 (E.D. Cal. 2020) ............................................................................ 3, 6

18

*Odom v. Microsoft Corp.,*
    486 F.3d 541 (9th Cir. 2007) ............................................................................................... 9

19

20

*Parrish v. Volkswagen Grp. of Am.,*
    463 F. Supp. 3d 1043 (C.D. Cal. 2020) ............................................................................... 6

21

*Peel v. BrooksAmerica Mortg. Corp.,*
    788 F. Supp. 2d 1149 (C.D. Cal. 2011) ............................................................................... 2

22

23

*Pelayo v. Hyundai Motor Company,*
    No. 8:20-cv-01503-JLS-ADS, 2021 WL 1808628 (C.D. Cal. May 5, 2021) ........................ 9

24

*Robinson Helicopter v. Dana Corp.,*
    34 Cal. 4th 979 (2004) ................................................................................... 12, 13, 15, 16

25

26

*Seely v. White Motor Co.,*
    63 Cal. 2d 9 (1965) ........................................................................................................... 13

27

28

iv

**TABLE OF AUTHORITIES (cont.)**

*Page(s)*

*Semegen v. Weidner,*
    780 F.2d 727 (9th Cir. 1985) ........................................................................... 9

*Shamamyan v. FCA US LLC,*
    No. CV 19-5422-DMG (FFMx), 2020 WL 3643481 (C.D. Cal. Apr. 1, 2020) ...................... 10

Similarly, in *Reinger v. Hyundai Motor America,*
    122 F. Supp. 3d 888 (N.D. Cal. 2015) ................................................................. 7

*Sonner v. Premier Nutrition Corp.,*
    962 F.3d 1072 (9th Cir. 2020) ................................................................. 18, 19

*Toner for Toner v. Lederle Labs., Div. of Am. Cyanamid Co.,*
    779 F.2d 1429 (9th Cir. 1986) ...................................................................... 17

*U.S. ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) ......................................................................... 9

*Washington v. Baenziger,*
    673 F. Supp. 1478 (N.D. Cal. 1987) ................................................................ 2

*Watkins v. MGA Ent., Inc.,*
    No. 21-CV-00617-5JCS, --- F. Supp. 3d ---, 2021 WL 3141218 (N.D. Cal. July 26, 2021) . 19, 20

Statutes

Civ. Code § 1780 ............................................................................................. 18

Rules

Fed. R. Civ. P. 15(a)(2) .................................................................................. 21

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

**I      INTRODUCTION**

Tesla's motion to dismiss the Second Amended Complaint ("SAC") only confirms that Plaintiff Michael Ma has supplemented his factual allegations with sufficient particularity to plead his claims in this action. With regard to whether Ma has alleged his fraud claims with the particularity demanded by Rule 9, Ma can rebut each of Tesla's four arguments claiming that Ma has fallen short. First, Ma demonstrates that the SAC alleges Tesla's exclusive (or, at least, superior knowledge) about the scope and nature of the Suspension Defect. Next, Ma demonstrates how the SAC sufficiently alleges Tesla's pre-sale knowledge about the Suspension Defect. Ma also alleges the omissions Tesla should have revealed, and where those disclosures should have been made. And finally, Ma rebuts Tesla's claim that its omissions were immaterial, and thus unactionable. Indeed, Tesla is well aware that the performance of its vehicles' suspension system is material to consumers, which is why it included suspension performance as part of its vehicles' advertising campaign in the first place. Because Ma has satisfied all pleading requirements, the Court should deny Tesla's motion to dismiss.

As in its first motion to dismiss, Tesla also argues here that the economic loss rule bars Ma's claims because California law supposedly bars economic loss claims for fraudulent omission. Its argument is largely the same as the first time around, perhaps citing a few more federal district court cases supporting its position. But with due respect to those courts, none of them have grappled with the law as the California Supreme Court described it in *Erlich v. Menezes*, 21 Cal. 4th 543, 551-52 (1999), wherein the court held that a plaintiff can recover when an omission involves an "omission of a legal duty." Indeed, to this day the economic loss rule does not apply in California when "the duty that [gave] rise to tort liability . . . arises from conduct which is both intentional and intended to harm." *Id.* Because Ma alleges conduct intended to harm, it is contrary to California law for the economic loss rule to bar his claims.

And finally, the SAC sufficiently pleads Ma's ability to obtain injunctive relief. First, the SAC clarifies the basis upon which Ma lacks an adequate remedy at law, and therefore is able to obtain an injunction in equity. The cases Tesla cites are distinguishable on their facts and fail to address the ongoing safety issues affecting not only Ma, but the general public. Ma also sufficiently alleges his

1   standing to seek an injunction, having demonstrated in the SAC a sufficient potential for future harm to

2   him personally.

3       Because the SAC sufficiently pleads all of the prerequisites to support each of Ma's claim,

4   Tesla's motion to dismiss finds no support in its content, much less the applicable law governing the

5   Court's analysis. The Court should deny the motion to dismiss and permit Ma's claims to proceed to

6   litigation.

7                               **II        ARGUMENT**

8   **A.    The SAC Satisfactorily Pleads Tesla's Fraudulent Omissions**

9       As in its first motion to dismiss, Tesla concedes that allegations of omission may serve as

10  predicate acts for Ma's claims. Nevertheless, it argues that the SAC again fails to allege Tesla's

11  predicate duty to disclose the suspension defect. (Motion, Dkt. No. 58, at 13.) Tesla further argues that

12  Ma fails to allege Tesla's exclusive (or superior) knowledge of material facts it "knew the plaintiff did

13  not have." (*Id.*) In sum, Tesla asserts that Ma has failed to "describe the content of the omission and

14  where the omitted information should or could have been revealed" as the Court required when it

15  dismissed the FAC with leave to amend. (Order, Dkt. No. 44, at 11.) But though Tesla argues that the

16  SAC falls "decidedly short" of that mark, the SAC alleges a series of additional factual details to support

17  Ma's claims. (Motion, Dkt. No. 58, at 15.) These allegations now leave little question regarding the

18  actionable nature of Tesla's omissions.

19      As noted in Ma's earlier briefing, a plaintiff pleading actionable omissions need not satisfy the

20  same pleading standards as a plaintiff pleading an affirmative misrepresentation. This is because a

21  plaintiff pleading an actionable omission is unable to "specify the time, place, and specific content of an

22  omission" as precisely as a plaintiff making an affirmative misrepresentation claim. *Falk v. General*

23  *Motors Corp.*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007). For instance, a plaintiff pleading

24  omissions is unable to plead either "the specific time of the omission or the place, as he is not alleging

25  an act, but a failure to act." *Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987). What

26  the plaintiff can allege, instead, is the "identities of the parties" and when the plaintiff was misled. *See*

27  *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1159-60 (C.D. Cal. 2011). The plaintiff

28  must also allege "the content of the omission and where the omitted information should or could have

been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Marolda v. Symantec Corp.*, 572 F. Supp. 2d 992, 997 (N.D. Cal. 2009). But "conditions of the mind, such as knowledge and intent, may be alleged generally." *Id.*; *Obertman v. Electrolux Home Care Prods., Inc.*, 482 F. Supp. 3d 1017, 1024 (E.D. Cal. 2020).

The SAC's enhanced allegations leave no doubt about Tesla's ability to discern "what, exactly" Ma would have expected Tesla to disclose, and where. (*See* Motion, Dkt. No. 58, at 16.) The SAC alleges that as early as December 2013—several months before Ma purchased his vehicle—Tesla issued an internal Technical Service Bulletin documenting at least one problem with the vehicle's front lower control arm ball joints, a part of the automobile's suspension system. If the problem were left "uncorrected," the parts could be "subject to accelerated wear" and ultimately "require premature replacement of components." (SAC, Dkt. No. 49, at 13, ¶ 39.) The defective ball joints were but one symptom of the defective suspension system that only fully came to light after Chinese regulators released their report in 2020. Of course, Ma cannot allege precisely what Tesla knew when he purchased his automobile, but he plausibly alleges Tesla's knowledge of sufficient information to hold Tesla liable if the SAC's allegations are indeed true.

### 1.   Ma Alleges Exclusive (or Superior Knowledge) About the Suspension Defect

Tesla offers a series of arguments purportedly demonstrating that the SAC either fails to plead fraud with the necessary specificity or fails to plead Tesla's knowledge of the defect. First, Tesla argues that Ma failed to allege that Tesla had exclusive knowledge of the defect. (*See* Mot., Dkt. No. 58, at 7.) But Tesla overlooks that where a complaint alleges omissions, the defendant's knowledge can be alleged generally pursuant to Rule 8. *See Clark v. Am. Honda Motor Co.*, No. CV 20-03147 AB (MRWx), --- F. Supp. 3d ---, 2021 WL 1186338, at *10 (C.D. Cal. Mar. 25, 2021). Exclusive knowledge is established where "the defendant knew of a defect while the plaintiffs did not and, 'given the nature of the defect, it was difficult to discover." *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) (quoting *Collins v. eMachines*, 202 Cal. App. 4th 249, 256 (2011)). The SAC alleges that Tesla knew the full scope of the Suspension Defect even as it parceled out information about it for the purpose of containing public understanding of (and reaction to) the defect.

Exclusivity is not applied with "rigidity," and has long been found even in cases where there is publicly-available information about the defect, such as online. *Id.* Therefore, an inference of exclusive knowledge can be drawn from factual allegations that the defendant had "superior knowledge" to the plaintiff about the defect. *Id.* Superior knowledge is alleged merely through facts sufficient to demonstrate that the defendant knew more about the defect than the plaintiff did.

Here, Ma has alleged that Tesla issued at least one TSB, in 2013, describing at least a portion of the Suspension Defect. (SAC ¶¶ 37-39.) At the very least, this TSB suggests that Tesla had superior knowledge about the defect as compared to Ma. But even if Ma (or other members of the public) were aware of the TSB at the time, the TSB describes a defect lesser in scope than the SAC alleges. The existence of the TSB alone does not establish that Ma should have known about the severity of the Suspension Defect, or that the defect could not be repaired in the manner the TSB claimed.

Furthermore, the SAC also includes dozens of NHTSA complaints demonstrating Tesla's awareness of the Suspension Defect. *See Falk*, 496 F. Supp. 2d at 1096. Tesla argues that the NHTSA received these complaints after Ma purchased his vehicle but given the defect's nature, it is unreasonable to expect that reports would be made right immediately. The defect manifests over time. At this stage, it would be unfair to dismiss Plaintiff's lawsuit simply because Tesla managed to delay public discovery of the defect. This is all the more true because the SAC alleges that in 2016, reports suggested that Tesla was requiring customers to sign non-disclosure agreements in exchange for "goodwill repairs" on defective suspensions. (SAC, Dkt. No. 49 at ¶ 52.) If true, these allegations explain why Tesla was able to prevent public reporting of the defect for so long and supports the SAC's allegation that Tesla had early knowledge about the Suspension Defect.

Ma further alleges that Tesla knew about the defect through its own manufacturing and data-gathering processes, all of which would have tended to show the existence of the suspension defect. (*Id.* ¶¶ 36-37.) At the end of the day, of course, only Tesla could truly know whether it had exclusive knowledge of the alleged defect—for now, Ma has alleged sufficient facts to establish that knowledge and should be permitted to take discovery to establish it as fact.

2.     **The 2013 TSB Demonstrates Tesla's Pre-Sale Knowledge**

Next, Tesla argues that the TSB applied only to 2012-2013 model year vehicles and thus does not demonstrate that Tesla had knowledge of a defect in Ma's 2014 model year vehicle. But that argument is unavailing because it can be inferred at this stage that what Tesla knew about the 2012-2013 model vehicles would also apply to the 2014 model year vehicles. And all the more because the 2014 Model S suspension system is constructed from the same parts as the 2012-2013 Model S vehicles.[1] (SAC ¶ 23.)

Tesla cites *Aguila v. General Motors LLC*, NO. 1:13-CV-00437-LJO, 2013 WL 3872502, at *5 (E.D. Cal. July 25, 2013) to support the premise that pre-sale knowledge has not been alleged, but that case says very little in Tesla's support. In *Aguila*, the plaintiff had alleged the existence of certain TSBs the defendant had issued "between February 2009 and February 2010 regarding noises associated with steering systems," the same problem at issue in the litigation. *Id.* But all the court noted about those TSBs was that they were not issued for the "class vehicles." *Id.* Given GM's wide-ranging product lines, the TSBs in question could have been for any vehicle GM manufactured, including vehicles with little similarity to the old vehicles. (*Id.*)

But here, in contrast, Ma alleges the existence of TSBs covering the two model-year Model S vehicles immediately preceding Ma's 2014 model-year vehicle, a fact that itself infers Tesla's knowledge of the Suspension Defect, particularly where the same parts were in use. Indeed, it was the Tesla's internal knowledge regarding the Suspension Defect in the 2012-2013 vehicles that should have

---

[1] While Tesla obviously has direct exclusive knowledge of this fact, it can also be inferred from Tesla's own online parts catalog combined with information released in a March 16, 2015, update to its 2013 Technical Service Bulletin. Tesla's online parts catalog groups Tesla Model S vehicles into three groups: vehicles produced from February 2012 to March 2016; vehicles produced from April 2016 to January 2021; and vehicles produced from February 2021 to the present.  Within each of these groups there is no differentiation between the various model year vehicles relating to the parts intended for those vehicles.  Currently, in 2021, the part number for the "Front Knuckle LH" is 1043052-00-A—a different part number than part number 1013184-00-A.  But when Tesla issued an update of its 2013 TSB in March 2015, it still instructed dealers to replace the "Front Suspension Knuckle Assembly LH" with part number 1013184-00-A.  Therefore, because the Tesla Parts Catalog does not differentiate between Model S vehicles from February 20212 to March 2016, it is logical to infer—and, therefore, plausible—that, at least as of March 2015, this was the same front suspension knuckle that was installed on all Model S vehicles produced as of the date. While the SAC does not allege this information, Ma can amend the complaint to include this information should the Court rule it necessary to do so.

5

tipped Tesla off regarding the 2014 model year vehicles. *See Falk*, 496 F. Supp. 2d at 1096; *Parrish v. Volkswagen Grp. of Am.*, 463 F. Supp. 3d 1043, 1054 (C.D. Cal. 2020) (citing *Iqbal*'s admonition that a plaintiff need only plead facts allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Indeed, Tesla's arguments here were addressed in *MacDonald v. Ford Motor Company*, 37 F. Supp. 3d 1087, 1092-93 (N.D. Cal. 2014). In *MacDonald*, the named plaintiffs had purchased 2007 and 2008 model-year vehicles but argued that the defendant's TSBs involving the same vehicle, which were issued about the 2005 model-year vehicles in 2008 was insufficient evidence that it was aware of the alleged defect. But the court determined that the first TSB, though it related only to the earlier model-year vehicles, made it "plausible" that the defendant "knew of the defect in other model years because [the plaintiffs] allege the allegedly defective part in their vehicles is the same." *Id.* at 1095. The fact that Tesla issued the first TSB regarding these parts only months before Ma purchased his vehicle makes it similarly plausible that Tesla had pre-sale awareness of the defect. The SAC thus satisfies the plausibility standard applicable to demonstrating Tesla's pre-sale knowledge of the Suspension Defect.

Likewise, in *McCarthy v. Toyota Motor Corporation*, No. 8:18-cv-00201-JLS-KES, 2019 WL 3220579, at *4 (C.D. Cal. April 9, 2019), the defendant argued that certain TSBs alleged in the plaintiff's complaint were about a "similar" defect in a different year and model vehicle than those alleged in the complaint. But the court rejected the defendant's argument, concluding that discovery of a similar issue in a different vehicle can establish the defendant's pre-sale knowledge. *Id.* (citing *Acedo v. DMAX, Ltd.*, No. CV 15-02443 MMM(ASX), 2015 WL 129123565, at *13 (C.D. Cal. July 31, 2015) and *McVicar v. Goodman Global Inc.*, No. SACV 13-1223-DOC (RNBX), 2014 WL 12573992, at *7 (C.D. Cal. Nov. 13, 2014).

*In Obertman*, 482 F. Supp. 3d at 1024, the court determined that a plaintiff had appropriately pled an actionable omission because "by displaying the [relevant products] and describing their features, the product packaging implied that the Products were suitable for use as dehumidifiers, without disclosing that they had a critical defect that could result in the Products being rendered completely useless." In the court's view, this was sufficient to "put defendant on notice of what was omitted, namely the alleged defect, and where it should have been included, that is on the products' packaging.

1    The same is true here. Plaintiff has alleged that notice of the Suspension Defect was omitted and

2    described several places where he could have been notified of the Suspension Defect, including Tesla's

3    website. (SAC, Dkt. No. 49, at ¶¶ 18, 60, 73.) Moreover, Plaintiff specifically alleged his reliance on

4    Tesla's website—allegations burnished by the fact that in 2014, the only method of purchasing a Tesla

5    automobile was on Tesla's website. (*Id.* at ¶¶ 18, 60.) Again, Rule 9 particularity has been satisfied.

6    And in *Mui Ho v. Toyota Motor Corporation*, the plaintiff defeated a motion to dismiss after

7    pleading that the defendant was privy to "pre-release testing data, early consumer complaints about the

8    defect" and other sources of information, combined with the issuance of two TSBs in 2007 and 2010,

9    the first of which was three years after the start of the class. 931 F. Supp. 2d 987, 991 (N.D. Cal. 2013).

10   Despite the fact that the TSBs post-dated the class period, the court permitted the claim to proceed

11   because the plaintiff had sufficiently alleged facts from which it could be inferred that the defendant had

12   pre-sale knowledge of the defect. *Id.*; *see also MacDonald*, 37 F. Supp. 3d at 1095-96 (analyzing *Mui*

13   *Ho*). Similarly, in *Reinger v. Hyundai Motor America*, 122 F. Supp. 3d 888, 900 (N.D. Cal. 2015), the

14   court permitted claims to proceed when the plaintiffs alleged a connection between TSBs issued before

15   they purchased their vehicles and the defendants' resulting knowledge of the defect. Like there, the

16   defendants here argue that the TSBs are unconnected to the alleged defect, but those arguments are

17   better suited for a later stage of the litigation.[2] *Id.*

18   In its motion to dismiss, Tesla also addresses Ma's allegation that pre-test design and testing

19   yielded knowledge of the Suspension Defect, arguing that the allegation "lacks common sense" because

20   Tesla would never "identify problems with vehicles and then release vehicles for sale without addressing

21   the problems identified through such testing." (Mot., Dkt. No. 58, at 9.) Tesla claims that it would never

22   have "undertaken the time and expense of testing the suspension system in the putative class vehicles

23   only to ignore the test results after it identified a defect in the suspension system of those vehicles." (*Id.*)

24

25   _____

26   [2] Tesla argues that Ma has not alleged sufficient pre-sale knowledge of the Suspension Defect because
     the 2013 TSB cited in the SAC only relates to "2012-2013 Model S vehicles." (Dkt. No. 58 at 17.)

27   Given the stakes—including Tesla's well-publicized difficulties attempting to get automobiles off the
     assembly lines and fulfill its customers' orders—all of this is perfectly plausible, particularly where Rule

28   9 permits Ma to plead Tesla's intent and knowledge in general terms in the first place. (*See also infra*,
     fn. 1.)

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

1    But its argument misses the point of a motion to dismiss. Note that Tesla does not argue nature of the

2    underlying allegation—Tesla had knowledge of the Suspension Defect and sold the car anyway. Tesla

3    asks the Court to trust its claims that it would never have released its automobiles into the market

4    without resolving the defect. But neither Ma nor this Court have any assurances of this fact but Tesla's

5    self-serving arguments. And even if they did, factual disputes are resolved on a motion to dismiss in the

6    plaintiff's favor.[3] Given all of the above, Ma has more than met his burden to plead Tesla's pre-sale

7    knowledge of the Suspension Defect.

8           **3.      The SAC Pleads Tesla's Omissions About the Suspension Defect and Ma's Reliance**

9                      **on Those Omissions**

10          Tesla's second argument is that Ma failed to plead his reliance on Tesla's omissions with the

11   requisite particularity. But the SAC describes the precise sources Ma relied upon prior to purchasing his

12   Tesla Model S. Ma states that he reviewed "specific website pages regarding the qualities and

13   characteristics of the Tesla Model S"—so specific web pages on Tesla's website about the specific

14   model he ended up purchasing—including information about the Model S vehicle's construction,

15   features, and capabilities. (SAC, Dkt. No. 49 at 88, ¶ 60.) None of this leaves Tesla guessing as to what

16   Ma was relying upon when he purchased his vehicle. Indeed, Ma alleges that Tesla discussed "many of

17   the features regarding the Model S vehicle" but never revealed the Suspension Defect before (or after)

18   he purchased the vehicle. (*Id.*)

19          Tesla had an additional opportunity to disclose the Suspension Defect when Ma retrieved his

20   vehicle from Tesla's Fremont, California factory. Tesla gave Ma a tour of the factory and gave him

21   additional instructions regarding the vehicle's features. (*Id.* at ¶ 61.) Nevertheless, he was not told about

22   the Suspension Defect. (*Id.*) And Tesla's failure to disclose the Suspension Defect on the vehicle's

23   Monroney sticker is just another specific opportunity for disclosure. (*Id.* at ¶ 73.)

24

25   _____

26   [3] Tesla well knows that it was under the gun for all of 2014 to manufacture and sell as many
     automobiles as possible to satisfy market pressures, especially where the introduction of the Model X,
27   initially set for late 2013 or early 2014, had to be pushed back by almost two years. ("Tesla celebrates its
     10th year as a public company today. Here are the most important moments in its history,"
28   https://www.businessinsider.com/most-important-moments-tesla-history-2017-2 (last viewed Sept. 19,
     2021).) Again, Ma can plead this and additional facts if the Court finds it necessary to do so.

                                                         8

Tesla recognizes these allegations, but argues they are not detailed enough to satisfy Rule 9(b). But while Rule 9(b) provides for a "heightened" pleading standard, its purpose is not to demand the plaintiff pass a memory test in order to plead a claim; it is to give the defendant specific notice of the allegations against it. *See Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985) ("Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.") Thus, in *Odom v. Microsoft Corp.*, 486 F.3d 541, 554-55 (9th Cir. 2007), the Ninth Circuit held that allegations of wire fraud were sufficiently particularized even though the complaint did not plead the names of the specific corporate employees that alleged committed the fraudulent acts. Given that the plaintiff had encountered these employees in a retail setting several years before, the court determined it would be "unrealistic to expect that the retail consumer would remember the name of the cash register employee," and to require such knowledge prior to undertaking a lawsuit would "as a practical matter, defeat almost any suit based on such a fraud. *Id.*

But perhaps more importantly, the court emphasized that all Rule 9(b) requires is "the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Id.* Given the details alleged in the SAC, Tesla's defense will not be hampered merely because Ma cannot name the specific employees to whom he spoke or point Tesla specifically to the exact pages he saw on Tesla's website before purchasing his vehicle in 2014. *See also Andresen v. Int'l Paper Co.*, No. 2:13-cv-02079-CAS(AJWx), 2014 WL 2511283, at *5 (C.D. Cal. June 3, 2014) (citing *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("[T]he 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible . . . .")).

Indeed, Tesla argues that Ma made only "boilerplate allegations" with regard to Tesla's omissions on the website. (Mot., Dkt. No. 58, at 6-7.) But Tesla cites cases where the plaintiffs had alleged nearly nothing about the nature of the relevant disclosures, to the point that the court could not even confirm that the defendant was responsible for the representation. For instance, in *Pelayo v. Hyundai Motor Company*, No. 8:20-cv-01503-JLS-ADS, 2021 WL 1808628, at *6 (C.D. Cal. May 5,

2021), the plaintiff had alleged no facts at all about the content of any of the Defendants' advertising materials. The same in true regarding *Shamamyan v. FCA US LLC*, No. CV 19-5422-DMG (FFMx), 2020 WL 3643481, at *8 (C.D. Cal. Apr. 1, 2020), where the plaintiff made only broad and unidentified representations about its vehicles being "free of defects" and "product brochures, pamphlets, and media concerning the Subject Vehicles sold to Plaintiffs." There was no specificity about what had been represented, or why the plaintiff would have expected the defect to be disclosed on the website.

There are also specific facts applicable to this case that further increase the relevance of Tesla's representations on the website. The Ninth Circuit has held that where the "plaintiffs contended that they purchased or leased their vehicles from an authorized dealer, that contact with an authorized dealer is sufficient to show that the plaintiff would have been aware of a disclosure had it been made by the defendant's authorized dealer." *See Clark*, 2021 WL 1186338, at *10 (citing *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015) and *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967-68 (9th Cir. 2018)); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009) ("Requiring a plaintiff to identify (or suffer dismissal) the time, place, and content of an [omission] would effectively gut state laws prohibiting fraud by omission."). Where Plaintiff alleges that he bought his vehicle directly from Tesla on the website after reviewing information about his vehicle on the website, that is more than enough at this stage to allege a plausible omission. *See Diversified Indus., Inc. v. Vinyl Trends, Inc.*, No. 13-6194 (JBS/JS), 2014 WL 1767471, at *5 n.6 (D.N.J. May 1, 2014).

Tesla also mischaracterizes the SAC as alleging an entirely passive, or "pure" omission. (Mot., Dkt. No. 58, at 5-7.) But this is not the case. As explained above, Tesla was requiring that customers sign non-disclosure agreements in order to protect knowledge of the Suspension Defect from becoming public. It was only by preventing this information from coming to light that Tesla's omissions regarding the suspension would have their full effect. Tesla's active concealment of the Suspension Defect bolsters the SAC's allegations, further establishing Ma's claims.

---

10

1

### 4.     Ma Pleads that Tesla's Omission of Information About the Suspension Defect Is

2        Material

3        Ma alleges both that Tesla had exclusive knowledge of material facts not known to Ma and that

4   Tesla was "actively" concealing those facts. (*See, e.g.*, SAC, Dkt. No. 49, ¶¶ 28-29.) As a threshold

5   matter, Ma has sufficiently alleged that the defect is material because it manifests in a way that is unsafe

6   to drivers, passengers, and the general public. (*Id.*, ¶¶ at 100-102, 145-149.) Because it can be assumed

7   that reasonable consumers would not expect or assume such unsafe conditions, the alleged defect is

8   material. *See Falk*, 496 F. Supp. 2d at 1095 (holding that disclosure of faulty speedometer would be

9   material because it would "lead to traveling at unsafe speeds and moving-violation penalties").

10       To these allegations, Tesla responds that the suspension issue identified in its earlier TSBs

11  documents a "non-safety related condition" that only causes "premature replacement of components."

12  But that is simply Tesla asking the Court to take its TSB at face value, and that is not the standard by

13  which a motion to dismiss is decided. *See Mui Ho*, 931 F. Supp. 2d at 997-98 (holding that the

14  defendant's denial of a safety risk created questions of fact inappropriate for a motion to dismiss). More

15  to the point, the SAC does not allege that the Suspension Defect is of the nature described in the 2013

16  TSB—the SAC alleges a far worse defect rendering the entire suspension system a hazard.

17       In fact, Ma alleges that "Tesla has actively concealed the Suspension Defect from the public

18  through misleading public statements," and "gone to great lengths to convince the general public that the

19  Class Vehicles are safe and are not plagued by the Suspension Defect." (SAC, Dkt. No. 49, ¶¶ 29, 51.)

20  Furthermore, Tesla had already gone on record—in its traditional bombastic style, claiming that its

21  "reimagined" and "rigid body structure" gave it the "responsiveness and agility expected from the

22  world's best sports cars." (*Id.* at ¶ 32.) Ma further pleads Tesla's specific representations, as early as

23  2012, about engineering its vehicles' structure to be "strong, rigid, and lightweight." (*Id.* at ¶ 30.)

24  Further, the SAC alleges that the 2012 Model S "Owner Safety Information brochure" covered a series

25  of diverse topics about the vehicle's safety features but did not describe the suspension at all, much less

26  its inherent defects. (*Id.* at ¶ 31.) And in 2014—at the same time Ma was purchasing his vehicle, Tesla's

27  full-color Model S brochure described its vehicles with a "rigid body structure, nearly 50/50 weight

28  distribution, and a remarkably low center of gravity" made for a vehicle with the responsiveness and

agility expected from the world's best sports cars." (*Id.* at ¶ 32.) Tesla even singled out the suspension system, stating that it "works in harmony with the rigid and light Tesla platform to provide precision handling and optimum comfort." (*Id.*) Specifically, Tesla boasted that "after hundreds of iterations affecting every detail of the suspension, our vehicle dynamics team was able to achieve the rare outcome of simultaneously improving performance, comfort, and efficiency."[4] (*Id.*) Thus, Tesla was well aware that its suspension was sufficiently material to its prospective consumers to make its alleged benefits part of its marketing campaign.

**B.      The Economic Loss Rule Does Not Bar Ma's Fraudulent Concealment Claim**

Tesla continues to argue that the economic loss rule bars Ma's fraud cause of action because its alleged fraud is based on alleged omissions, not misrepresentations. To support its position, Tesla still relies on several federal district court cases that have analyzed the California Supreme Court's ruling in *Robinson Helicopter v. Dana Corp.*, 34 Cal. 4th 979, 991 (2004), and determined that because the Supreme Court limited *Robinson* to cases involving affirmative representations, its holding does not reach omissions. But that conclusion is an overreach based on a fundamental flaw in reasoning.[5] It is true that *Robinson* involved affirmative misrepresentations. At the same time, that does not mean California law bars plaintiffs from seeking the economic losses resulting from intentional fraudulent concealment. *See NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1032 (E.D. Cal. 2013) ("[*Robinson*] strongly suggests no meaningful distinction exists between intentional concealment and intentional misrepresentation; rather the material distinction is whether the tortious conduct was intentional or negligent."). Indeed, Tesla overlooks the California Supreme Court's conclusion, in a case pre-dating *Robinson*, that "an omission to perform a contract obligation is never a tort, ***unless that omission is also an omission of a legal duty***." *Erlich v. Menezes*, 21 Cal. 4th 543, 551-52 (1999)

---

[4] *See also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 957 (N.D. Cal. 2014) ("The Court also notes that it is odd for Ford to quibble with materiality here when it promoted the MFT system as a desirable component of a vehicle in the first place. In other words, if the MFT system was so desirable, then it would not be surprising for Plaintiffs to consider a problem with the system—particularly a systemic one—a material fact.").

[5] Tesla made the same argument in its initial motion to dismiss Tesla's FAC, but the Court did not decide the issue because it held that Ma had failed to plead his claims with particularity. (Order, Dkt. No. 44, at 11.) Notably, Tesla addresses none of Ma's arguments in its motion to dismiss the SAC.

12

(emphasis added). Likewise, in *Erlich*, the Supreme Court recognized that the economic loss rule does not apply in tort where "the duty that [gave] rise to tort liability is either completely independent of the contract or ***arises from conduct which is both intentional and intended to harm***." *Id.*

In some sense, Tesla's misunderstanding of the law is understandable because it has been led there by several federal district court decisions agreeing with its conclusion that *Robinson* constituted a limited exception to the economic loss rule, including *In re Ford Motor Co. DPS6 Powershift Transmission Products Liability Litigation*, 483 F. Supp. 3d 838, 848-49 (C.D. Cal. 2020). In *Ford Motor*, the plaintiff argued that Ford had knowingly suppressed material facts about a defect in its vehicles' transmissions. Ford defended by arguing that the economic loss rule barred recovery of any economic losses caused by the alleged omissions. The court agreed with Ford, noting that the dispute turned on the "scope of an exception" to the economic loss rule set forth in *Robinson*. *Id.* at 850. Focusing on that "exception," the court reviewed *Robinson* and concluded that it had allowed plaintiffs to pursue economic losses resulting from affirmative misrepresentations but did not discuss omissions. *Id*. Thus, the court concluded that California Supreme Court had expanded an exception to California's economic loss rule in a way that did not provide for omissions.[6]

But the error comes in assuming that *Robinson* constituted an exception to, or an expansion of, the economic loss rule. Nowhere in *Robinson* did the California Supreme Court use the words "exception" or "expansion" to describe its holding. Again, a review of the genesis of the economic loss rule in California is necessary to understand why courts continue to overread the holding in *Robinson*. California's economic loss rule arose out of the Supreme Court's analysis of cases involving negligence and strict liability.[7] *See Seely v. White Motor Co*., 63 Cal. 2d 9, 19 (1965) (holding that economic loss rule limited negligence claims to contract recoveries); *Jimenez v. Superior Court*, 29 Cal. 4th 473, 482-

---

[6] Judge Birotte is not the only judge to come mistakenly to this conclusion, as Tesla points out that several judges have interpreted *Robinson*'s holding as a limitation of the rule rather than a limitation on the rule's application to the underlying facts of the *Robinson* case. (*See* Motion, Dkt. No. 58, at 11-12.)

[7] The Supreme Court of Washington observed that part of the problem has been the tendency of lawyers and judges to reference this concept as the "economic loss rule," which "proved to be a misnomer." *Eastwood v. Horse Harbor Found., Inc*., 170 Wash. 2d 380, 387-88 (2010). The court noted that "economic losses are sometimes recoverable in tort, even if they arise from contractual relationships," and even identified fraudulent concealment as just such a tort. *Id.* (citing *Obde,v. Schlemeyer*, 56 Wash. 2d 449, 452 (1960)).

83 (2002) (holding that "law of contractual warranty" governs "damage to the product itself" in strict liability cases"). The crux of both these torts is foreseeability. A defendant sued under either theory is liable to those plaintiffs foreseeably harmed by the defendant's conduct.

But neither *Seely* nor *Jimenez* considered the consequences of intentional conduct—that is, fraud. In *Erlich*, the California Supreme Court did. 21 Cal. 4th at 551-52. Indeed, it was in *Erlich* that the Supreme Court addressed the independent duty rule, prior to later applying it in *Robinson*. *Id.* at 551 ("[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law."). In *Erlich*, the Supreme Court determined that conduct amounting to a breach of contract can be tortious so long as it "violates a duty independent of the contract" and "aris[es] from the principles of tort law." *Id.*

That formulation itself should be clear enough to prevent this Court from having to guess at what the California Supreme Court would decide if expressly faced with the question of whether fraudulent concealment is tort that arises from the violation of an independent legal duty. Indeed, *Erlich* expressly addressed the question by stating that "an omission to perform a contract obligation is never a tort, ***unless that omission is also an omission of a legal duty***." *Id.* at 551-52 (emphasis added). The flipside of this premise is that when there has been an omission in violation of an independent legal duty, that omission constitutes an actionable tort despite the economic loss rule.[8] Indeed, it is this formulation that resolves the concerns of those courts that have suggested that *Robinson* did not speak to the independent duty triggered by an actionable omission. Thus, *Erlich* had already stated the law, because it can hardly be disputed that intentional concealment is a tort arising from a separate and independent legal duty. *See Burch v. CertainTeed Corp.*, 34 Cal. App. 5th 341, 348 (2019) (alleging fraudulent concealment requires demonstration that "the defendant was under a duty to disclose the fact to the plaintiff"); *Freedom*

---

[8] In *Erlich*, the Supreme Court ultimately held that the plaintiffs could not obtain economic loss damages but that was in the context of reviewing a jury verdict that found the defendants liable only for negligence. The court conceded that economic loss damages had been recovered in tort cases involving contracts, but that "more than mere negligence has been involved in each case where tort damages have been permitted." *Id.* at 553-54 ("This is a claim for negligent breach of a contract, which is not sufficient to support tortious damages for violation of an independent tort duty."). That the economic loss rule does not bar recovery for intentional concealment of facts a defendant otherwise has an independent duty to disclose simply follows from that premise. To the extent that Tesla attempts to distinguish Erlich on this basis, that simply raises the same problem Ma raises with extending the holding of *Robinson* to bar fraudulent omission.

14

1   *Transport, Inc. v. Travelers Cos., Inc.*, No. EDCV 16-213 JGB (SPx), 2016 WL 7496731, at *5 (C.D.

2   Cal. Mar. 24, 2016) (describing the four circumstances in which a legal duty arises to disclose known

3   facts).

4          But despite the California Supreme Court's resounding signal that actionable omissions

5   constitute an independent duty, many federal courts analyzing this issue have mistakenly focused on

6   *Robinson*'s language limiting its analysis of the law as stated in *Erlich* to the facts that existed in

7   *Robinson*, where the defendant allegedly engaged in affirmative misrepresentations. Then, as in *Ford*

8   *Motor*, these courts have held that *Robinson* intended to carve out fraudulent omissions from its

9   "exception" to the rule. 483 F. Supp. 3d at 848-49. But that is not what the Supreme Court did. In

10  *Robinson*, the Supreme Court applied the general law it had earlier discussed in *Erlich* to *Robinson*'s

11  specific facts.

12         The common thread that links *Erlich* and *Robinson* is the law; the economic loss rule does not

13  apply to torts arising from a duty "independent" of the defendant's contractual duties. *Erlich* confirmed

14  that neither negligence nor strict liability create the kind of independent duty necessary to avoid

15  application of the economic loss rule, because foreseeability does not create an independent duty. In

16  *Erlich*'s formulation, "foreseeability is not synonymous with duty; nor is it a substitute." *Id.* at 552. But

17  here, Ma's claim is based on Tesla's alleged concealment of facts that it had "a duty to disclose [] to the

18  plaintiff." *See, e.g.*, *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 248 (2011) ("[D]efendant

19  had a common law duty to avoid making partial, misleading representations that effectively concealed

20  material facts.").

21         The rule as stated in *Erlich* makes sense because there is no good reason to distinguish between

22  affirmative misrepresentations and omissions for purposes of applying the economic loss rule. Certainly,

23  none of the courts Tesla cites give one outside of the premise that *Robinson* supposedly prevents it. *See*

24  *infra* n.8. Meanwhile, in *Erlich* the California Supreme Court recognized its "focus[] on intentional

25  conduct" was what gave "substance to the proposition that a breach of contract is tortious only when

26  some independent duty arising from tort law is violated." 21 Cal. 4th at 554 (citing *Applied Equipment*

27  *Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994)). And in *Robinson*, the court emphasized

28  the very same public policy concerns, explaining that "California [] has a legitimate and compelling

interest in preserving a business climate free of fraud and deceptive practices." 34 Cal. 4th at 992 (citing *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1064 (1999)). Indeed, the court could not have been plainer about its concern that a contract should not be "a license allowing one party to cheat or defraud the other." *Id.* (citing *Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493, 501 (S.D. 1997)). And compared to all of this, there has not been a single indication that California courts should treat fraudulent omission or concealment differently than intentional misrepresentation. The Supreme Court did not make that distinction and has never intended to make that distinction. Indeed, the law does not make that distinction.

The Sixth District of the California Court of Appeal accurately analyzed the Supreme Court's jurisprudence in *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 328 (2006), a case where the plaintiff alleged various misrepresentations and omissions against the defendant. The defendant attempted to avoid the plaintiff's fraud claim by applying the economic loss rule, but the court disagreed. It began by noting that whether the economic loss rule applied depended on "whether the California Supreme Court intended in *Robinson* to obviate the application of the economic loss rule to all intentional affirmative fraud causes of action where the fraud exposes the plaintiff to liability or the court intended to provide a narrow exception to the economic loss rule that applies only where that fraud cause of action also accompanies, but is independent of, a breach of contract cause of action." *Id.* Notable, of course, is that the Court of Appeal never discussed whether there should be a difference in how to apply the economic loss rule to intentional omissions as opposed to intentional misrepresentations. Instead, it resolved the question by holding that *Robinson* "precludes the application of the economic loss rule to any intentional affirmative fraud action where the plaintiff can establish that the fraud exposed the plaintiff to liability." *Id.* at 328.

*Santa Clara*'s discussion of the "structure" of the *Robinson* opinion underscores the point. *Id.* As the Court of Appeal noted, the first part of the *Robinson* opinion was concerned with whether the "wrongful conduct constituted tortious conduct, not whether the economic loss rule applied to it." *Id.* It was only "after the court held that [the] conduct was a tort independent of [the] breach of contract that the court addressed the application of the economic loss rule." *Id.* And that method of analysis led to the Supreme Court's ruling that "***fraud itself is immune*** from application of the economic loss rule because

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

fraud is particularly blameworthy and therefore unlike both contract causes of action and products liability causes of action." *Id.* (emphasis added). The same analysis here leads to the same result. An intentional fraud—this time an omission or concealment—derives from the breach of a tort duty independent of a contract, and thus the economic loss rule does not apply.[9] *Id.* Other state courts have recognized that there is no reason to treat intentional misrepresentation differently from intentional omission as well. *See McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers—Centerra LLC*, 486 P.3d 439, 454-55 (Col. Ct. App. Jan. 14, 2021*)*; *Obde v. Schlemeyer*, 56 Wash. 2d 449, 452 (1960).

California law is clear. The Supreme Court's rulings—not just *Robinson*, but also *Erlich*—establish that the economic loss rule does not bar fraud claims—whether they are rooted in misrepresentation or omission. But even if the Court believes it must make an "informed prophecy" as to how the California Supreme Court would rule, it would be error to conclude, as various other district courts have done, that it would exclude intentional fraudulent concealment from those torts not subject to the economic loss rule. *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir. 2008); *see also Centurion Properties III, LLC v. Chicago Title Ins. Co.*, 793 F.3d 1087, 1089 (9th Cir. 2015) ("Certification is a means 'to obtain authoritative answers to unclear questions of state law.'") (quoting *Toner for Toner v. Lederle Labs., Div. of Am. Cyanamid Co.*, 779 F.2d 1429, 1432 (9th Cir. 1986)). In sum, this Court has every reason to conduct its own independent analysis of California law and thereby reach a different conclusion than previous courts have reached.

The distinction also matters because the economic losses Ma alleges are not fully captured by a contractual recovery. While Ma may recover the amount he spent on replacing the brakes by pursuing his warranty claim, he is also entitled to the difference between the value of the automobile he believed he was purchasing and the value of the automobile as afflicted by the defect. Because this is true, Ma may pursue his fraud claim even though his damages are limited to economic losses.

---

[9] Notably, the Supreme Court denied the defendant's motion for review of the Court of Appeal's decision. *County of Santa Clara v. Atlantic Richfield Co.,* 137 Cal. App. 4th 292 (2006), *review denied* (June 21, 2006).

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

1

**C.      Ma Is Entitled to Injunctive Relief**

2          The SAC also resolves the Court's concerns with whether Ma can obtain an injunction based on

3   his claims. Tesla argues that Ma must establish that he lacks an "adequate remedy at law" before

4   securing restitution for past harm under the UCL and CLRA. (Mot., Dkt. No. 58, at 13 (citing *Sonner v.*

5   *Premier Nutrition Corp.*, 962 F.3d 1072, 1081 (9th Cir. 2020)).) But Tesla claims that Ma is barred from

6   obtaining an injunction because he can obtain monetary relief for his legal claims. Thus, Tesla concludes

7   that the Court cannot grant injunctive relief for what it characterizes as Ma's "past harm." But Tesla's

8   argument relies on a misunderstanding of the requirement that a plaintiff must allege future harm in

9   order to obtain an injunction.

10         **1.      Ma Demonstrates Standing to Seek an Injunction**

11         With regard to Ma's pleading of potential future harm, Tesla argues that he does not have

12  standing to seek an injunction for future harm because he cannot demonstrate he is "likely to be harmed

13  in the future, and the threat of injury is "actual and imminent." (Mot., Dkt. No. 58, at 17.) First, Tesla

14  argues that Ma has not pled any factual basis for supporting his allegation that the suspension defect

15  continues to be a danger. But what Tesla identifies as Ma's allegations are really just its own

16  interpretation of those allegations. Ma alleges that the Suspension Defect, for instance, involves the rear

17  connecting rod of the front extension which may crack and break, "affecting control of the vehicle."

18  (SAC, Dkt. No. 49, at ¶ 26.) In general, the SAC alleges that the control arm assembly parts subject to

19  failure include a series of parts, including "the front upper and lower control arms, front suspension aft-

20  link, front suspension fore-link, rear suspension upper link assembly, and rear suspension lower control

21  arm assembly. (*Id.* at ¶ 24.) While the Suspension Defect manifested itself in Ma's vehicle in one way,

22  the alleged defect involves a series of parts, not all of which have been replaced in the subject vehicle

23  and there is no way for Ma to know whether Tesla actually repaired the defect. Furthermore, the Court

24  has already determined that Ma sufficiently identified the defect in the FAC, and the same is true in the

25  SAC. (*See* Order, Dkt. No. 44, at 6.) As such, Ma continues even now to drive a car that is subject to the

26  Suspension Defect, and thus a safety hazard that cannot be remedied by money alone. *See* Civ. Code

27  § 1780; *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab.*

28

1  *Litig.*, 754 F. Supp. 2d 1145, 1194 (C.D. Cal. 2010); *Bryde v. General Motors, LLC*, No. 16-cv-02421-

2  WHO, 2016 WL 6804584, at *15 (N.D. Cal. Nov. 17, 2016).

3        Tesla also argues that Plaintiff's allegation that he may be interested in purchasing future Tesla

4  vehicles does not satisfy the standing requirement because he would not be purchasing the 2013 through

5  2018 model S or X vehicles that are the subject of the lawsuit. But that isn't quite the standard. In

6  *Davidson v. Kimberly Clark Corp.*, 889 F.3d 956 (9th Cir. 2018), the Court found a pleading that should

7  the plaintiff have encountered the same representations on the goods in the future, the plaintiff could

8  "not rely on that representation with any confidence." *Id.* at 971. In other words, the plaintiff there faced

9  the injury of "being unable to rely on [the defendant's] representations of its product in deciding whether

10  or not she should purchase the product in the future. *Id.* at 971-72. Ma (and the other plaintiffs here)

11  plead the same issue. Tesla has long established itself as a leader in clean energy automobiles, and Ma

12  (like the other plaintiffs) want to be on the vanguard of that ongoing change. Ma thus pleads a plausible

13  claim of potential future harm sufficient to satisfy Article III.

14        **2.**    **Ma Lacks an Adequate Remedy at Law Thereby Allowing Ma to Seek an Injunction**

15        In *Sonner*, the Court found that a plaintiff must establish "that she lacks an adequate remedy at

16  law before securing" any kind of equitable restitution for past harm under California consumer

17  protection statutes. 962 F.3d at 1081. But that standard is not as high a bar as Tesla suggests. It simply

18  means that a plaintiff must demonstrate that he or she will not be made fully whole by strictly legal

19  remedies. *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994)

20  (injunctive relief available where there is "no adequate legal remedy"); *Koniag, Inc. v. Koncor Forest*

21  *Resource*, 39 F.3d 991, 1000 n.9 (9th Cir. 1994). Tesla converts this test, however, into a claim that Ma

22  requests an injunction only for the purpose of "remedy[ing] past conduct" rather than "prospective relief

23  to address future conduct." (Mot., Dkt. No. 58, at 15.)

24        For this premise, Tesla cites *Watkins v. MGA Ent., Inc.*, No. 21-CV-00617-5JCS, --- F. Supp. 3d

25  ---, 2021 WL 3141218, at *17 (N.D. Cal. July 26, 2021). But Tesla fails to read *Watkins* closely. In that

26  case, the plaintiffs had not alleged any facts "establishing that their remedies at law are inadequate," but

27  had further failed to "alleged any facts establishing that they are likely to face future danger from the

28  alleged defect, which they expressly allege has now been fixed." *Id.* There were two plaintiffs in

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

1  Watkins, a case which involved a toy with a dangerous design flaw. *Id.* at * 2. The first plaintiff alleged

2  that after her daughter was injured by the toy, she called and emailed the defendant to complain. *Id.* She

3  alleged that the defendant responded by stating that the product had since been redesigned and sending

4  her fifteen dolls as a gesture for her child's injury. *Id.* She had also been reimbursed for the purchase

5  price of the toy from the retailer. *Id.* The second plaintiff alleged that his mother-in-law purchased it for

6  his child, but that he was forced to take the toy away after finding out about the injury to the first child.

7  *Id.* He alleged that he did not allow his daughter to play with the toy "for fear of injury similar" to the

8  first child. *Id.*

9       Given these allegations, it is easy to understand why the *Watkins* court held that the plaintiffs

10  were unable to seek an injunction in federal court. Neither plaintiff had alleged an injury that could not

11  be fully recompensed through a legal recovery. In the first plaintiff's case, she had already stopped using

12  the toy and had recovered the cost of the toy from the retailer. Her daughter's physical injury was not at

13  issue in the lawsuit, and there was no threat of further injury because she was not going to use the toy in

14  the future. And if she wanted to repurchase the toy, it had been redesigned. In the second plaintiff's case,

15  his injury was more straightforward—it could be resolved by his warranty claims.

16       But what is true for a $89 child's toy is not true for a purportedly high-performance electric-

17  powered vehicle marketed by Tesla as a societal and market gamechanger. Given the tens of thousands

18  of dollars Ma invested in purchasing the vehicle, it is no surprise that Ma continues to use the vehicle.

19  While Ma alleges that Tesla undertook repairs in 2019, paying over $1,300 as a result, Ma does not (and

20  cannot) know whether those repairs were actually successful, particularly considering the nature of the

21  alleged defect in the SAC. (*See* SAC, Dkt. No. 49, at ¶¶ 22-25.) As such, Tesla is simply wrong that Ma

22  has failed to plead potential future harm. Consider what happens if Plaintiff obtains merely legal

23  damages, and then the vehicle suffers again from the Suspension Defect—either a failure of the

24  supposedly repaired part or another part of the suspension subject to the original defect—Plaintiff will

25  be in the same position as before. In effect, he will have to take his damages and use them to effect

26  further repair of the same defect while suffering the safety risks attendant to the failed suspension (or,

27  most likely, both).

28

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG

The same facts distinguish most, if not all, of the cases Tesla cites in support of its position. In *Gibson v. Jaguar Land Rover North America, LLC*, CV 20-00769-CJC(GJSx), 2020 WL 5492990, at *3 (C.D. Cal. Sept. 9, 2020), the underlying claim was that automobile's "in-tank fuel pump" was intermittently failing, but that the defendant was refusing to repair it under its longer California emissions warranty for high-priced warranty parts. The plaintiff's complaint was that the in-tank fuel pump was a "high-priced warranty part" worthy of coverage, though the defendant had not identified it as such a part in its warranty booklet. Setting aside the merits of that particular claim, it was one that could be resolved merely by awarding the plaintiff damages if he was correct.

In *Klaehn v. Cali Bamboo, LLC*, No. 19cv1498-LAB (KSC), 2020 WL 3971518, at *1 (S.D. Cal. July 13, 2020), the issue was whether the defendant's flooring was as durably and high-quality as advertised. The allegation was that the flooring was subject to "premature cracking, splitting, warping, shrinking, buckling, separating, and scratching" despite the defendant's claims that it sold the "World's hardest floors." *Id.* Regardless of the underlying merits, none of these alleged flaws were likely to kill the plaintiffs. The same was true in *In re MacBook Keyboard Litigation*, No. 5:18-cv-02813-EJD, 2020 WL 6047253, at *1 (N.D. Cal. Oct. 13, 2020), where the plaintiff alleged that the defendant's product had a defective keyboard. The court concluded that even if the keyboard was defective, the plaintiff could be made whole through monetary damages because such damages would ultimately reflect the value of the plaintiff's computer with the defective keyboard. *Id.* at *4.

Similar problems afflict the automobile cases Tesla cites. *Consumer Advocates v. Daimler Chrysler Corp.* (Cal. Ct. App. Jan. 31, 2005) is not only unpublished (and thus, not even binding law in California), it addressed the defendant's warranty practices in a manner that could be resolved with a claim for damages under the Song-Beverly Act. The rest of the cases hold generally that complaints should be dismissed when there are no allegations in the complaint showing that the plaintiffs' legal claims would have provided them with an adequate remedy. (Mot., Dkt. No. 58, at 17-19.) But here, Ma has pled the required allegations and thus satisfies the prerequisites for seeking an injunction.

## D.   Ma May Obtain Leave To Amend

Federal Rule of Civil Procedure 15(a)(2) requires leave to amend to be given "freely" and when "justice so requires." To the extent that the pleadings can be cured by the allegation of additional facts,

the plaintiff should be afforded leave to amend. *See Cook, Perkiss and Liehe, Inc. v. No. Calif. Collection Serv. Inc*., 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted). This motion alone demonstrates that Ma can plead more details to support his claims should it be necessary to do so. Therefore, should the Court be inclined to grant Tesla's motion to dismiss, Ma respectfully requests leave to further amend his complaint.

### III      CONCLUSION

Ma's additional pleadings are intended to resolve the Court's concerns with the FAC. In every respect, Ma alleges sufficient facts to establish each of his claims. For these reasons, the Court should dismiss Tesla's motion to dismiss.

Dated:  September 20, 2021                          Respectfully submitted,

By:   /s/ *David C. Wright*
                                                                David C. Wright

Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
Steven A. Haskins, State Bar No. 238865
sah@mccunewright.com
Mark I. Richards, State Bar No. 321252
mir@mccunewright.com
**MᴄCᴜɴᴇ Wʀɪɢʜᴛ Aʀᴇᴠᴀʟᴏ LLP**
3281 Guasti Road, Suite 100
Ontario, California 91761

*Counsel for Plaintiffs and the Putative Class*

Plaintiff's Opposition to Tesla's Motion to Dismiss the SAC
Case No.: 4:20-cv-08208-HSG